UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v. ) | CR. No. 21-cr-111-JJM-PAS |
| ) | |
| DAVID WORSTER, ) | |
| Defendant. ) | |
| ) | |
| ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief United States District Judge.

Before the Court is Defendant David Worster's Motion to Suppress. ECF No. 44. Mr. Worster moves on the grounds that his Fifth Amendment right to counsel, and thereby against self-incrimination, were violated. ECF No. 44-1 at 1. The government responds in opposition by arguing that Mr. Worster's assertion of his Fifth Amendment right to counsel was not unequivocal, and therefore he did not invoke his constitutional rights. ECF No. 48.

## I.    BACKGROUND

Law enforcement executed a search warrant at 36 Hilton Street in Pawtucket. *Id.* at 1. Mr. Worster was located, handcuffed, and brought to Task Force Officer ("TFO") Matthew Smith's car. *Id.* at 2. TFO Smith had Mr. Worster sit behind the front passenger's seat, where TFO Smith buckled Mr. Worster's seatbelt. *Id.* at 2. Though the rear passenger seat where Mr. Worster sat remained open, TFO Smith stood beside Mr. Worster outside the car. *Id.* at 2.

Special Agent Rachel Robinson entered the car, sat in the front passenger seat, turned around, and informed Mr. Worster of the situation: "that a search warrant had been obtained for [Mr. Worster's] apartment and told him that she had some questions." *Id.* at 2–3. Agent Robinson then read Mr. Worster his Miranda rights. *Id.* at 3. Mr. Worster signed the Miranda rights form. *Id.* at 3.

Agent Robinson turned her recorder on and began questioning Mr. Worster. *Id.* at 3. In response to her first question, Mr. Worster responds: "I -- I don't know." ECF No. 44-1 at 1–2. Agent Robinson then said to Mr. Worster: "You just said, I'll tell you exactly how it happened." *Id.* at 2. While Agent Robinson is saying this statement, Mr. Worster raises his voice over hers and says: "Yeah, but -- but I just -- I want my lawyer, though." *Id.* at 2. Nonetheless, Agent Robinson continued to interrogate Mr. Worster for an hour.

## II.   DISCUSSION

"We sometimes forget how long it has taken to establish the privilege against self-incrimination, the sources from which it came and the fervor with which it was defended." *Miranda v. Arizona*, 384 U.S. 436, 458 (1966). "As a noble principle often transcends its origins, the privilege has come right-fully to be recognized in part as an individual's substantive right. . . . That right is the hallmark of our democracy." *Id.* at 460 (internal quotation marks omitted). To evaluate the applicability of this privilege, courts undertake a two-step process: the first step is whether the defendant was in custody, and the second is whether there was an interrogation. *See id.* at 460. In fact, the First Circuit has held that *Miranda*

warnings are only required when these two conditions are met. *See United States v. Hinkley*, 803 F.3d 85, 90 (1st Cir. 2015). If there was a custodial interrogation, properly invoked *Miranda* protections must be respected by law enforcement. *See Michigan v. Mosley*, 423 U.S. 96, 103 (1975); *Berghuis v. Thompkins*, 560 U.S. 370, 388–89 (2010).

## A.   Custodial Interrogation

"The question in these cases is whether the privilege is fully applicable during a period of custodial interrogation." *Miranda*, 384 U.S. at 460. As alluded to, before the Court can address Mr. Worster's arguments, it must first determine whether he was subject to a custodial interrogation. The nature of a custodial interrogation, as conveyed by its semantics, can be divided into two parts. The Court now addresses those two parts in turn.

### 1.   Custody

Several factors are relevant to whether a suspect is in custody, including, but not limited to, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (citations omitted). Once such factors are taken under consideration, "[t]he question is whether, viewed objectively, those circumstances constitute the requisite 'restraint on freedom of movement of the degree associated with a formal arrest.'" *Hinkley*, 803 F.3d at 90 (quoting *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011)).

"[I]n order to determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation.'" *Howes*, 565 U.S. 499, 509 (omission in original) (citing *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam)). Nonetheless, as alluded, this inquiry is still an objective one. *See J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) ("As we have repeatedly emphasized, whether a suspect is 'in custody' is an objective inquiry."); *Stansbury*, 511 U.S. at 322 (same). Objective inquiries are evaluated using the reasonable person standard. Here, that inquiry requires examining whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

This restriction of movement is not a dispositive consideration, however. *See Berkemer v. McCarty,* 468 U.S. 420, 437–38 (1984). Courts "instead ask[] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. 499, 509. Indeed, the Supreme Court's "cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010).

It is hard to imagine a universe in which a court finds that Mr. Worster was not in custody. As the government states in their brief, Mr. Worster "was brought in handcuffs to TFO Smith's car. . . . TFO Smith reached across Defendant to buckle his seatbelt and then stood to Defendant's side, outside the car." ECF No. 48 at 2.

Indeed, it was not simply that Mr. Worster was physically restrained; TFO Smith's presence outside the car imbued a psychological restraint, further signifying that Mr. Worster was not free to leave. A reasonable person in Mr. Worster's position would not believe that they were free to leave, nor end the interrogation. As a result, the Court finds that Mr. Worster was in custody while being questioned.

### 2.   Interrogation

The second inquiry in an analysis under *Miranda* is whether there was an interrogation. "[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The Supreme Court elucidates on what an incriminating response entails, defining it as "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial."[1] *Id.* at 301 n.5 (1980) (emphasis in original).

Much like the custody inquiry, the interrogation inquiry is an objective one. *See United States v. Henry*, 447 U.S. 264, 282 n.6 (1980) ("Rejection of an objective test in this context is not inconsistent with *Rhode Island v. Innis* . . . since 'the policies underlying the two constitutional protections [Fifth and Sixth Amendments] are quite distinct.'" (quoting *Innis*, 446 U.S., at 300 n.4 (alterations in

---

[1] As the Supreme Court notes in *Innis*, "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980) (emphasis in original).

original)); *United States v. Sanchez*, 13 F.4th 1063, 1074–75 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 842 (2022) ("This inquiry is objective, focusing 'on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer.'" (quoting *United States v. Yepa*, 862 F.3d 1252, 1257 (10th Cir. 2017)). As a result, "beyond an objectively defined 'pressure point,' statements will be deemed presumedly compelled and therefore properly excluded, absent the countercoercive effect of Miranda warnings." *Henry*, 447 U.S. at 282 n.6 (citing *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).

One notable carveout is known as the public safety exception, a doctrine enumerated in *New York v. Quarles*, 467 U.S. 649 (1984). Under this exception, *Miranda*, and its protections, are not applicable when "police officers ask questions reasonably prompted by a concern for the public safety."[2] *Quarles*, 467 U.S. at 656. Indeed, the Supreme Court "conclude[d] that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. As a result, "[t]he prophylactic Miranda warnings . . . are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" *Id.* at 654 (alterations in original) (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)).

---

[2] The term "reasonable," as it often does, bears significant weight, indicating that reviewing court must look objectively to the circumstances presented to the officer or officers. *See New York v. Quarles*, 467 U.S. 649, 663 (1984) (O'Connor, J., concurring in the judgment in part and dissenting in part).

From the very beginning of her conversation with Mr. Worster, Agent Robinson's questions were designed to elicit an incriminating response. When Mr. Worster responded with "I don't I don't know" to Agent Robinson's first question, the next thing that Agent Robinson says is: "You just said I'll tell you exactly how it happened..." ECF No. 48 at 4. This statement by Agent Robinson reveals that her goal in recording their conversation was to get what Mr. Worster told her onto the tape recorder.[3] It is incredibly unlikely that Agent Robinson would have pushed so hard to get Mr. Worster to say what was said if it did not have some incriminating nature to it. *Cf. Miranda v. Arizona*, 384 U.S. 436 (1966) ("Confessions remain a proper element in law enforcement.").

There is no question that Mr. Worster was interrogated within the definition of *Miranda*. This is the precise situation *Miranda* foresaw. *See Howes v. Fields*, 565 U.S. 499, 508 n.5 (2012) (noting that lower courts have "applied the traditional context-specific analysis to determine whether the circumstances of [the defendant's] interrogation gave rise to 'the coercive pressure that *Miranda* was designed to guard against'" (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)). Its "safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Custodial interrogations are inherently coercive and can create an even more

---

[3] The Court does not address, nor is it before us, whether these prior statements were given before or after Mr. Worster was Mirandized.

coercive atmosphere when an investigating officer presses on a defendant to tell that officer what they want to hear. *See Howes*, 565 U.S. at 507 n.4 (2012).

The government's argument that the public safety exception applies is without merit. This exception applies to situations in which an individual is in custody, is subject to an interrogation, and gives an incriminating response without being Mirandized. Mr. Worster, was in custody and was Mirandized, even signing a document confirming that he was read his rights. The facts are quite different from *Quarles*, too. In *Quarles*, the officer "asked only the question necessary to locate the missing gun before advising [Quarles] of his rights." *New York v. Quarles*, 467 U.S. 649, 659 (1984). Here, Agent Robinson put a tape recorder in between herself and Mr. Worster to document the interview. That she was even able to do so indicates that there was not a concern for public safety. It further suggests that she had more questions than would be necessary to locate the alleged weapon.

The Court finds that Mr. Worster was subject to a custodial interrogation. As a result, the Court must find that Mr. Worster was entitled to the protections under *Miranda*. For those protections to apply, however, they must be properly invoked. The Court now turns to this question.

### B.    Invocation

Once a defendant has been given their Miranda warnings, they may invoke those rights at any time throughout a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation

> must cease.  At this point he has shown that he intends to exercise his
> Fifth Amendment privilege; any statement taken after the person
> invokes his privilege cannot be other than the product of compulsion,
> subtle or otherwise.

*Id.* at 473–74.  "The requirement that law enforcement authorities must respect a

person's exercise of that option counteracts the coercive pressures of the custodial

setting."  *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).   Thus, the relevant inquiry

becomes whether the "right to cut off questioning was scrupulously honored."  *Id.*

(internal quotation marks omitted).   Relevant factors evaluating whether an

invocation was "scrupulously honored" include whether the interrogation

immediately ceased.  *See id.* at 106.

   For this right to be honored, it must be invoked unequivocally.  "Invocation of

the Miranda right to counsel 'requires, at a minimum, some statement that can

reasonably be construed to be an expression of a desire for the assistance of an

attorney.'"  *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v.*

*Wisconsin*, 501 U.S. 171, 178 (1991)).   That is, "[i]f an accused makes a statement

concerning the right to counsel 'that is ambiguous or equivocal' or makes no

statement, the police are not required to end the interrogation . . . or ask questions

to clarify whether the accused wants to invoke his or her Miranda rights."  *Berghuis*

*v. Thompkins*, 560 U.S. 370, 381 (2010) (citing *Davis*, 512 U.S. at 459).   Courts have

held that, even if there is some equivocation, the relevant inquiry is whether "a

reasonable officer would have understood that [a defendant] was clearly and

unequivocally invoking the right to counsel."  *Abela v. Martin*, 380 F.3d 915, 926

(6th Cir. 2004) (internal quotation marks omitted).  In light of these circumstances,

the Court must evaluate whether Mr. Worster's statement is one "that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*"[4]   *See McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (emphasis in original).

"An accused in custody, 'having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,' unless he validly waives his earlier request for the assistance of counsel." *Smith v. Illinois*, 469 U.S. 91, 94–95 (1984) (per curiam) (citing *Edwards, infra,* 451 U.S. at 484–85).   Yet "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).   A proper invocation represents the stopping point, such that nothing after the point of invocation shall be deemed admissible. "Under *Miranda* and *Edwards* . . . an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Smith*, 469 U.S. at 105.

There can be no question that the statement "I want my lawyer" constitutes an unequivocal invocation of ones right to counsel during a custodial interrogation. It would be paradoxical for the Court to find, on the one hand, that Mr. Worster's statement that "I want my  lawyer" constitutes an unequivocal invocation of one's right to immediately terminate an interrogation, and yet on the other hand find

---

[4] Though admittedly redundant, it bears repeating that the term "reasonably" reflects an objective inquiry. *See supra* note 2 and accompanying text.

that very invocation could not (or should not) be "reasonably construed as being an expression of a desire" to end that interrogation. Mr. Worster's invocation is not only obvious from the transcript of his interview, but it can also clearly be heard on the recording. ECF No 48-2; *see also* ECF No 48 at 4 (verifying same in transcript). The Court finds that it would be unreasonable to construe Mr. Worster's invocation as anything but an unequivocal expression of his desire to end the conversation with Agent Robinson.

Often in matters such as this, it is the defendant who failed to properly invoke their right (as defined by the Supreme Court). *See, e.g., Davis v. United States*, 512 U.S. 452, 462 (1994) (affirming the lower courts' rulings that "'Maybe I should talk to a lawyer' was not a request for counsel"). Here, there was not scrupulous adherence to the proper invocation. The reason that the interrogation continued is because Agent Robinson failed to adhere to Mr. Worster's invocation.

But this conclusion is clouded by the fact that Agent Robinson talked while this invocation occurred.[5] Agent Robinson talked over Mr. Worster's invocation. The government's contention that Agent Robinson did not hear the invocation and therefore that the invocation was ambiguous misses the mark. Whether the right to counsel has been invoked is an "objective inquiry." *Id.* at 458–59. This Court

---

[5] The government relies significantly on *United States v. Dudley*, 804 F.3d 506 (1st Cir. 2015). *Dudley* presents factually dissimilar circumstances from the instant matter. In that case, as the government states in their brief, "[a]t issue . . . was whether police heard a suspect tell his wife to call his attorney." ECF No. 48 at 8. Regardless of whether police heard the suspect tell his wife to call his attorney, the First Circuit rested their decision on the fact that informing one's wife to contact an attorney would not constitute an unequivocal invocation of one's constitutional right to an attorney.

listened to the recording of the custodial interrogation of Mr. Worster. Agent Robinson was in the front seat, turned around and was looking straight at Mr. Worster when he said, "I want my lawyer." The Court finds that a reasonable person would have heard the unequivocal and unambiguous invocation of the right to counsel by Mr. Worster.[6]

## III. CONCLUSION

The Court finds that Mr. Worster's constitutional right against self-incrimination was violated when Agent Robinson did not end the interrogation after Mr. Worster unequivocally and unambiguously invoked his Fifth Amendment right to counsel. All statements following Mr. Worster's invocation ("Yeah, but -- but I just -- I want my lawyer, though.") are inadmissible. As a result, the Court GRANTS Mr. Worster's Motion to Suppress. ECF No. 44.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States Chief District Judge

June 16, 2022

---

[6] The Government suggests that "the agents will testify that they did not hear the burst as a request for counsel." ECF No. 48 at 1. There is no need for an evidentiary hearing because whether the agents heard it or not is a subjective analysis and the United States Supreme Court instructs us to apply an objective standard.