## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID WORSTER; and<br>ALEXZANDRIA CARL,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 21-cr-111-JJM-PAS

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Defendants David Worster and Alexzandria Carl each move to dismiss parts of their indictments for failing to charge a constitutionally permissible offense. (ECF Nos. 89, 91.) They contend that the constitutional sea change wrought by *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), makes several counts unlawful.

Mr. Worster claims that charges under 18 U.S.C. § 922(g)(1) and § 922(g)(3), which respectively forbid felons and users of controlled substances from possessing firearms, violate the Second Amendment as applied to him. Like Mr. Worster, Ms. Carl argues that a charge under § 922(g)(3) violates the Second Amendment as applied to her. From that, she also contends that derivative charges related to false statements made while purchasing a firearm must be dismissed.

For the reasons below, Mr. Worster's Motion (ECF No. 89) is GRANTED IN PART and DENIED IN PART. Ms. Carl's Motion (ECF No. 91) is GRANTED.

# I.    BACKGROUND

This case arises from a United States Customs and Border Protection search. In August 2021, CBP intercepted two packages containing suppressor components: one addressed to a post-office box in Mr. Worster's name and the other addressed to Ms. Carl's home, where Mr. Worster resided at the time.[1]  (ECF No. 92 at 3.)

Law enforcement officers then executed a search at Ms. Carl's residence, where they uncovered "a firearm manufactured outside Rhode Island, a variety of firearm parts and paraphernalia, numerous rounds of ammunition manufactured outside Rhode Island," as well as "a medical marijuana card" in Mr. Worster's name, "a small marijuana grow with two mature marijuana plants, and a small bag of dried marijuana." (ECF No. 92 at 3.)  In an interview with law enforcement, Ms. Carl said that she "had been using marijuana since the age of twelve" and "smoked once or twice a week," but "indicated that she did not use marijuana" on a form she filled out when buying a rifle found at the residence.  (ECF No. 96 at 2.)

Mr. Worster has a prior criminal history.  In June 2009, he pleaded guilty to several Massachusetts state-law offenses: (1) trafficking a controlled substance, specifically between 14 and 28 grams of cocaine, (2) possession of a firearm, (3)

---

[1] At this early stage, these "facts" are only allegations by the government. Recall that when a defendant challenges an indictment's sufficiency, "what counts" are "the charging paper's allegations, which we must assume are true." *United States v. Guerrier*, 669 F.3d 1, 3–4 (1st Cir. 2011).   The indictment's allegations are constitutionally sufficient—insofar as the indictment properly "parrot[s] the language" of federal statutes, *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007)—but factually threadbare.  The Court thus must draw from the Complaint and the parties' briefs to provide enough detail to conduct the as-applied constitutional review that Mr. Worster and Ms. Carl seek.

possession of ammunition, (4), possession of an explosive device, and (5) a second count of possession of an explosive device.[2] (ECF No. 92-1 at 2–4.) The same year, he also pleaded guilty to (1) possession of a firearm, (2) sale of an illegal large capacity firearm magazine, (3) possession of ammunition, (4) possession with intent to distribute cocaine, and (5) a second count of possession with intent to distribute cocaine.[3] *Id.*

After the search of Ms. Carl's residence, a grand jury indicted Mr. Worster on four charges:

- Count I: Unlawful importation of a firearm in violation of 18 U.S.C. §§ 922(l) and 924(a)(1);
- Count II: Unlawful importation of a firearm in violation of 18 U.S.C. §§ 922(l) and 924(a)(1);
- Count III: Felon in possession of firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and
- Count IV: Marijuana user in possession of firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2).

(ECF No. 17-1 at 1–3.) The grand jury also indicted Ms. Carl on three charges:

- Count V: Marijuana user in possession of firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2);
- Count VI: False statement in acquisition of firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2); and
- Count VII: False statement to federally licensed gun dealer in violation of 18 U.S.C. § 924(a)(1)(A).

---

[2] Mr. Worster's trafficking controlled substances offense "was vacated and dismissed with prejudice" on December 13, 2018, "but the other convictions remained intact." (ECF No. 92 at 2.)

[3] In its brief, the government also described Mr. Worster as having pleaded guilty to the unlicensed sale of ammunition (ECF No. 92 at 2), but that is incorrect. That charge was dismissed, with a *nolle prosequi* entered. (ECF No. 92-1 at 3.)

(ECF No. 17-2 at 2.) Mr. Worster moves to dismiss two of the four counts against him, Counts III and IV, and Ms. Carl moves to dismiss all counts against her: Counts V, VI, and VII. (ECF No. 89; No. 91.)

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

A defendant can seek the dismissal of an indictment on the grounds that the statute authorizing the charges is unconstitutional. *See, e.g., United States v. Carter* 752 F.3d 8, 12 (1st Cir. 2014). Their constitutional attack on the statute can come in two forms: a facial challenge or an as-applied challenge. To succeed on a facial challenge, the defendant must show "that the statute lacks any 'plainly legitimate sweep.'" *Hightower v. City of Boston*, 693 F.3d 61, 77 (1st Cir. 2012) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). In other words, every application of the statute must be unconstitutional for a successful facial challenge.

But to succeed on an as-applied challenge, the defendant must only show that the statute is unconstitutional as applied to the circumstances of their case. *Id.* at 71–72. Mr. Worster and Ms. Carl bring as-applied challenges to several sections of §§ 922 and 924. (ECF No. 89; No. 91.) These challenges "are the basic building blocks of constitutional adjudication." Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000).

4

### III.   DISCUSSION

A.   Legal Landscape of the Second Amendment

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. Amend. II.

### 1.   *Heller* and *McDonald*

In 2008, the Supreme Court held for the first time in 219 years that the Second Amendment protects the rights of individuals to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570 (2008). The plaintiff, a D.C. special police officer, challenged a prohibition on handguns by claiming a Second Amendment right to possess them in his home without registering or licensing them. *Id.* at 575–76. The Court explained that the prefatory words "[a] well regulated Militia, being necessary to the security of a free State," did not confine the Amendment's protection to those connected to military or law enforcement. *Id.* at 627–28. Instead, the Court held, the Amendment protected the right of the unaffiliated individual to protect himself. *Id.* at 628–29.

But the right established in *Heller* was not without context or limitation. Instead, the individual's right was for the use of handguns "for self-defense in the home." *Id.* at 636. The Amendment was not adopted, the majority made clear, "to protect the right of citizens to carry arms for any sort of confrontation." *Id.* at 595. Instead, the right was understood historically to be tied to "the right of having and using arms for self-preservation and defence." *Id.* at 594. The Court also cautioned

5

that nothing in *Heller* was intended to confer a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

In short, *Heller*'s holding was relatively narrow. Relevant here, the Court specifically eschewed "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

That *Heller* was specifically concerned with protecting an individual's right to exercise self-defense in their home was confirmed two years later in *McDonald v City of Chicago*, 561 U.S. 742, 749–50 (2010). There, the Court held that the Second Amendment applied to the states through the Fourteenth Amendment. *McDonald* was decided by a Court almost identical with the one issuing the *Heller* opinion. The five-justice majority remained the same and, in the minority, retiring Justice David H. Souter had been replaced by Justice Sonia M. Sotomayor.

*McDonald* granted certiorari on the single question of "[w]hether the Second Amendment right to keep and bear arms is incorporated as against the States by the Fourteenth Amendment's Privileges or Immunities or Due Process Clauses." *McDonald v. Chicago*, No. 08-1521, 2009 WL 1640363, at *1 (June 9, 2009) (Petition for Writ of Certiorari). In answering "Yes," the Court did not address the scope of *Heller* but merely considered whether its holding bound the states. The plaintiffs had asserted only a right to be free from state restriction on the ability to "keep handguns in their homes for self-defense," *McDonald*, 561 U.S. at 750, and that is all

that was decided. The discussion of incorporation itself reflected the Court's long-held view that the application of incorporated rights to the states is identical with the Federal Government. *Id.* at 765.

*McDonald* described *Heller* as holding "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense." *Id.* at 749–50. In other words, the *Heller* Court "stressed" that "the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was 'the central component of the right itself.'" *McDonald*, 561 U.S. at 787 (quoting *Heller*, 554 U.S. at 599) (emphasis in original). More than a decade passed before the Court addressed the scope of *Heller*—and thus the scope of the Second Amendment.

### 2. The post-*Heller* consensus

In the interim, the Circuit Courts of Appeals were busy applying *Heller*. They were near-unanimous on two things. First, they agreed that *Heller* conferred maximum protection only with respect to the exercise of self-defense in the home. Second, as to the world outside the home, *Heller* determined that intermediate scrutiny was appropriate, requiring only that those statutes be "substantially related" to a compelling government interest and that there be a reasonable fit between that interest and the means outlined in the statute to advance it.

The First Circuit applied *Heller* first in *Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018), reviewing a challenge to a state licensing statute as implemented by the cities of Boston and Brookline. *Id.* at 662. The plaintiffs sought the right to carry

firearms generally. *Id.* at 664. While allowing unrestricted possession in the home, the licenses issued for public carry were restricted at the discretion of the municipality, which made determinations based on the purported purpose of carrying the firearm, such as an individualized need for self-defense, employment, hunting, or target practice. *Id.*

The question posed in *Gould* was precisely that later answered—differently—in *Bruen*: "Does the Second Amendment protect the right to carry a firearm outside the home for self-defense?" *Id.* at 666. In answering the question in the negative, the First Circuit employed the same construct adopted by its sister Circuits. *Id.* at 668–69. This construct used a two-step analysis that determined first "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Id.* This first step was "a backward-looking inquiry, which seeks to determine whether the regulated conduct 'was understood to be within the scope of the right at the time of ratification.'" *Id.* at 669 (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)). The second step, if the desired conduct falls outside the "core" and some regulation is therefore permitted, was to decide what level of scrutiny must be brought to bear upon the regulation. *Id.* The Circuit Courts of Appeals, including the First Circuit, again acting in harmony, determined that intermediate scrutiny was appropriate. *Gould*, 907 F.3d at 668–69; *see* supra n.13 (collecting cases from other Circuits).

### 3.    *Bruen*

But in *Bruen*, the Supreme Court bluntly cast aside the reasoned analysis of all these Circuit Courts of Appeals. While acknowledging that "the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," *Bruen*, 597 U.S. at 17, the high court nonetheless "decline[d] to adopt that two-part approach." *Id.* In its place, the Court raised a presumptive umbrella of protection whenever "the Second Amendment's plain text covers an individual's conduct." *Id.* Rather than looking at the scope of the right to determine whether a statute such as § 922 is constitutional (and then applying a means-end analysis), the focus is on the restriction to determine whether it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

Although *Bruen* did not purport to define the parameters of lawful purposes, it stressed that "individual self-defense is 'the central component' of the Second Amendment right." *Id.* at 29 (quoting *McDonald*, 561 U.S. at 767). The *Bruen* opinion opened with the declaration that "[W]e ... now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 10.

In dissent, Justice Breyer noted that the majority's "near-exclusive reliance on history is not only unnecessary," but also "deeply impractical." *Id.* at 107 (Breyer, J., dissenting). After all, courts are "staffed by lawyers, not historians," and legal experts "typically have little experience answering contested historical questions or

applying those answers to resolve contemporary problems." *Id.* The majority's approach, he worried, raised far more questions than answers. For instance:

> Do lower courts have the research resources necessary to conduct exhaustive historical analyses in every Second Amendment case? What historical regulations and decisions qualify as representative analogues to modern laws? How will judges determine which historians have the better view of close historical questions? Will the meaning of the Second Amendment change if or when new historical evidence becomes available? And, most importantly, will the Court's approach permit judges to reach the outcomes they prefer and then cloak those outcomes in the language of history?

*Id.* (Breyer, J., dissenting).

### 4. The post-*Bruen* "discord"

Since *Bruen*, Justice Breyer's concerns have largely proven prescient. That is especially obvious at the Nation's district courts, who have found themselves on the beachhead of this constitutional sea change. *See, e.g., United States v. Bullock*, 679 F. Supp. 3d 501, 519–29 (S.D. Miss. 2023) (Reeves, J.) (critiquing *Bruen*), *rev'd*, 123 F.4th 183 (5th Cir. 2024). Three problems are particularly clear.

The first is methodological: courts and lawyers generally lack the necessary expertise and resources to answer the complex historical questions *Bruen* raises. The *Bruen* standard "requires original historical research into somewhat obscure statutory and common law authority from the eighteenth century by attorneys with no background or expertise in such research." *United States v. Nutter*, 624 F. Supp. 3d 636, 640 n.6 (S.D. W.Va. 2022).

And that research is often unaided either by expert opinion or amicus briefs. *Bullock*, 679 F. Supp. 3d at 519–20. The lack of expert opinions is unlike other

complex areas of the law, like antitrust or toxic torts, where "the parties each submit detailed expert reports supporting their positions." *Id.* at 520. And though the lack of amicus briefs at the district level is "understandable," it has downstream effects: "the appellate courts do the best with the briefs they have," but ultimately "all that matters is the Supreme Court's historical review, conducted de novo as a legal rather than a factual question, with dozens of amicus briefs never before seen by another court." *Id.* at 522. It is obvious, then, that *Bruen*'s "history-and-tradition test is burdensome," particularly "to courts with heavier caseloads and fewer resources" than the Supreme Court. *United States v. Rahimi*, 602 U.S. 680, 742–43 (2024) (Jackson, J., concurring); *see also id.* at 739 (Barrett, J., concurring) ("Courts have struggled with this use of history in the wake of *Bruen*.").

The second problem is workability: the *Bruen* test lends itself to ambiguity and inconsistency. Since *Bruen*, diverging results have appeared in a variety of criminal and civil Second Amendment contexts. *Compare United States v. Harrison*, 654 F. Supp. 3d 1191, 1222 (W.D. Okla. 2023) (holding that 18 U.S.C § 922(g)(3) violates Second Amendment), *with United States v. Le*, 669 F. Supp. 3d 754, 760 (S.D. Iowa 2023) (upholding statute); *compare Herrera v. Raoul*, 670 F. Supp. 3d 665, 669 (N.D. Ill. 2023) (holding that an Illinois law prohibiting assault weapons was enforceable), *with Barnett v. Raoul*, 671 F. Supp. 3d 928, 948 (S.D. Ill. 2023) (holding that the same law was unenforceable under the Second Amendment), *vacated by Bevis v. City of Naperville*, 85 F.4th 1175, 1203 (7th Cir. 2023).

11

This is true not only at the district courts but also the appellate courts. *Compare United States v. Jackson*, 69 F.4th 495, 501 (8th Cir. 2023) (upholding § 922(g)(1)), *with Range v. Att'y Gen.*, 124 F.4th 218, 232 (3d Cir. 2024) (en banc) (holding § 922(g)(1) unconstitutional as applied). Justice Jackson put it best: this "discord is striking when compared to the relative harmony that had developed prior to *Bruen*." *Rahimi*, 602 U.S. at 743 (Jackson, J., concurring).

The third problem is the most fundamental: *Bruen* requires judges to embrace the past—or one version of it, at least—at the expense of the present.[4] It gives pride of place to a historical tradition of firearm regulation that was often, by modern standards, at odds with our Constitution. In seventeenth-century England and the American colonies, for instance, many were disarmed based on their religion, which served as a quick-and-easy litmus-test for dangerousness. *See, e.g., Kanter v. Barr*, 919 F.3d 437, 456–58 (7th Cir. 2019) (Barrett, J., dissenting) (collecting sources explaining why Catholics were disarmed en masse), *overruled by Bruen*, 597 U.S. 1.

Similarly, enslaved people, free Black Americans, and Native Americans were all thought to pose "immediate threats to public safety and stability," and so were categorically "disarmed as a matter of course" both before and after the Founding. *Id.* at 458. These sorts of regulations would not survive constitutional muster today,

---

[4] It is far from settled that the Founding generation thought about the relationship between the judiciary and the Second Amendment in the way we now must. One scholar has compellingly argued that the Second Amendment "was not written for judges or with legal remedies in mind" and that *Heller* and *Bruen* thus presuppose "an anachronistic approach to rights that the Founding generation did not share." *See* Jonathan Gienapp, *Against Constitutionalism Originalism* 51–52 (2024).

but now, they help define what is permissible under the Second Amendment. *See Binderup v. Att'y Gen.*, 836 F.3d 336, 368 (3rd. Cir. 2016) (Hardiman, J., concurring) (noting that historical "complete bans on gun ownership by free blacks, slaves, Native Americans, and those of mixed race" would each today "be plainly unconstitutional"), *overruled by Bruen*, 597 U.S. 1.

Not only were these regulations often constitutionally repugnant in substance, but also in origin. After all, another "glaring flaw in any analysis of the United States' historical tradition of firearm regulation ... is that no such analysis could account for what [the tradition] would have been if women and nonwhite people had been able to vote for the representatives who determined these regulations." *State v. Philpotts*, 194 N.E.3d 371, 373 (Ohio Ct. App. 2022) (Brunner, J., dissenting). It is hard to imagine that any woman, Black American, or Native American took part in drafting or passing any regulations from the relevant timeframe. *See* Joy Milligan & Bertrall L. Ross II, *We (Who Are Not) The People: Interpreting the Undemocratic Const.*, 102 Tex. L. Rev. 305, 306 (2023). In other words, "the people" who crafted firearms regulations and whom the Second Amendment originally protected were hardly the whole Nation. *See* Thurgood Marshall, *Reflections on the Bicentennial of the U.S. Const.*, 101 Harv. L. Rev. 1, 2 (1987) ("When the Founding Fathers used this phrase ["We the people"] in 1787, they did not have in mind the majority of America's citizens.")

*Bruen*'s "myopic focus on history and tradition," one rife with prejudice, also "fails to give full consideration to the real and present stakes of the problems facing

our society today." *Rahimi*, 602 U.S. at 706 (Sotomayor, J., concurring).  The price to the present is three-fold.  Legislatures, "seeking to implement meaningful reform for their constituents while simultaneously respecting the Second Amendment, are hobbled without a clear, workable test for assessing the constitutionality of their proposals." *Id.* at 747 (Jackson, J., concurring).  Courts, who are "currently at sea when it comes to evaluating firearms legislation, need a solid anchor for grounding their constitutional pronouncements." *Id.*  And most importantly, the public "deserve clarity" when the judiciary "interprets our Constitution," but they do not get it.  *Id.*

Some look at the lay of the land and conclude that the Second Amendment's "history is consistent with common sense." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).  Perhaps, but it is becoming clearer and clearer that *Bruen* is not.

### 5.  *Rahimi*

Recognizing the manifold issues *Bruen* poses, the Supreme Court tried to correct course in *United States v. Rahimi*, 602 U.S. 680, 691 (2024).

The case arose from a sordid set of facts.  Following an argument with his girlfriend, Zachary Rahimi "grabbed her by the wrist, dragged her back to his car, and shoved her in, causing her to strike her head against the dashboard." *Id.* at 686.  Then realizing that a bystander saw the whole thing, he retrieved a gun from under the passenger seat.  *Id.*  In the meantime, his girlfriend escaped; Rahimi, in turn, fired shots as she fled.  *Id.*  She sought and successfully obtained a restraining order finding that he had committed family violence.  *Id.*  Months later, after several more instances where Rahimi terrorized his community with a gun, the police obtained a

14

warrant to search his residence. *Id.* at 687–88. There, "they discovered a pistol, a rifle, ammunition—and a copy of the restraining order." *Id.* at 688.

Rahimi was then indicted on one count of possessing a firearm while subject to a domestic violence restraining order, in violation of § 18 U.S.C. § 922(g)(8). *Id.* He pleaded guilty while maintaining a Second Amendment challenge on appeal. Following *Bruen*, the Fifth Circuit sided with Rahimi, vacating his conviction and holding that § 922(g)(8) violated the Second Amendment as understood by *Bruen.* 61 F.4th 443, 460–61 (5th Cir. 2023).

The Supreme Court reversed in an 8-1 decision. Suggesting that "some courts have misunderstood the methodology" of the Court's recent Second Amendment cases, it sought to clear things up.[5] 602 U.S. at 692. *Heller, McDonald,* and *Bruen,* the majority wrote, "were not meant to suggest a law trapped in amber." *Id.* at 691. Instead, the historical analysis "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. More specifically, the court must "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen,* 597 U.S. at 29) (cleaned up). "Why and how the regulation

---

[5] The Court's choice of language here is telling. Rather than owning up to *Bruen*'s shortcomings, it chose to lay the blame at the feet of the hundreds of judges who have tried to apply it. But given the widespread confusion following *Bruen,* perhaps the Court should shoulder some responsibility too. After all, as the ancient Athenian general Pericles supposedly remarked, "Having knowledge but lacking the power to express it clearly is no better than never having any ideas at all."

burdens the right are central to this inquiry." *Id.* To be square with the Second Amendment, the challenged law "must comport" with its underlying principles, "but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

The majority's attempt to clarify the analysis, however, became muddied down with six separate writings, so whether *Rahimi* has cleared up the confusion is yet to be seen.[6] In any event, it is against that backdrop that the Court proceeds.

### B.    Whether the Second Amendment applies to Mr. Worster and Ms. Carl

To determine whether Mr. Worster and Ms. Carl can mount Second Amendment challenges to their indictments, the Court must first determine whether it applies to them.

Recall that the Second Amendment establishes "the right of the people to keep and bear arms." U.S. Const. Amend. II. The government argues that possession of firearms "by felons and unlawful users of controlled substances falls outside the scope of the Second Amendment's right to bear arms." (ECF No. 92 at 10.) The upshot of its argument is that Mr. Worster and Ms. Carl are no longer part of "the people" protected by the Second Amendment.

There is a "divergence of opinion in the federal courts" on this question. *United States v. Pierret-Mercedes*, 731 F. Supp. 3d 284, 292 (D.P.R. 2024); *United States v.*

---

[6] Chief Justice Roberts wrote the opinion, in which Justices Alito, Sotomayor, Kagan, Gorsuch, Kavanaugh, Barrett, and Jackson joined. 602 U.S. at 680. Justice Sotomayor filed a concurring opinion, in which Justice Kagan joined. *Id.* Justices Gorsuch, Kavanaugh, Barrett, and Jackson each filed separate "solo" concurrences. *Id.* Justice Thomas, the author of *Bruen*, filed a dissent. *Id.*

*Bartucci*, 658 F. Supp. 3d 794, 800–03 (E.D. Cal. 2023) (collecting cases). Some courts take a conduct-based approach, where the inquiry turns largely on whether the proposed conduct falls within the Second Amendment. Others take a status-based approach, considering whether the challenger is part of "the people" whom the Second Amendment protects. Still others take a mixed approach, considering both and then some.

The Court will follow the second approach, focusing primarily on whether the challengers are part of "the people" protected by the Second Amendment. That is the case for three reasons.

The first is constitutional text. Other individual constitutional rights given to "the people" do not fall away simply because of their criminal history—or in Ms. Carl's case, simply because she has been accused of a crime. For instance, do felons and alleged marijuana users lose their First Amendment right to assemble peaceably? *See* U.S. Const. Amend I (protecting "the right of the people peaceably to assemble"). Or to be protected against unreasonable searches and seizures? *See* U.S. Const. Amend IV (protecting "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"). Of course not.[7] The government offers no good reason to treat the Second Amendment's text any differently in this respect.

---

[7] True, prisoners' rights are more limited while incarcerated, but felons "are not categorically barred from First Amendment or Fourth Amendment protection because of their status." *Range*, 124 F.4th at 226.

Second, the Supreme Court's interpretation of the Second Amendment confirms that Mr. Worster and Ms. Carl still fall within its reach. To support its argument, the government largely relies on language from several Supreme Court decisions referencing the right to bear arms as only belonging to "law-abiding, responsible citizens." (ECF No. 92 at 10–11.) Read in a vacuum, that language from *Heller* favors the government's position. But "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). Instead, the Supreme Court has recently "emphasize[d]" that its "opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." *Ross*, 598 U.S. at 374.

Those cases' contexts are revealing. In *Heller*, *McDonald*, and *Bruen*, the plaintiffs' criminal histories were not at issue, so the Court's references to "law-abiding, responsible citizens" were dicta. And as the Third Circuit recently observed, "*Heller* said more" on the meaning of "the people." *Range*, 124 F.4th at 226. *Heller* explained that the phrase "unambiguously refers to all members of the political community, not an unspecified subset," so there is a "strong presumption" that the Second Amendment right "belongs to all Americans." 554 U.S. at 580–81.

*Rahimi* reinforces this reading of the text. In holding that § 922(g)(8) was constitutional as applied to the defendant, the Court rejected the government's contention that he could be "disarmed simply because he is not 'responsible,'" because it was "unclear what such a rule would entail." 602 U.S. at 701. Further, the Court

reiterated that *Heller* and *Bruen* "said nothing about the status of citizens who were not 'responsible.'" *Id.* at 702.

Third, there is a growing Circuit consensus that the Second Amendment still protects those charged under § 922(g). *See, e.g.*, *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) ("Marijuana user or not, Paola is a member of our political community and thus has a presumptive right to bear arms."); *United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024) ("Nothing in the Second Amendment's text draws a distinction among the political community between felons and non-felons—or, for that matter, any distinction at all."); *Range*, 124 F.4th at 228 ("We reject the Government's contention that felons are not among 'the people' protected by the Second Amendment.") (cleaned up).

True, other district courts in this Circuit have reached different conclusions on this question, holding those charged under § 922(g) fall outside the Second Amendment's scope. *See, e.g.*, *United States v. Fulcar*, 701 F. Supp. 3d 49, 55–56 (D. Mass. 2023) (collecting cases). But that approach cannot be squared with clear constitutional text, recent Supreme Court precedent, and persuasive—and increasingly pervasive—Circuit reasoning.

To be clear: the fact that the Second Amendment applies to Mr. Worster and Ms. Carl is the start—not the end—of the analysis. Mr. Worster and Ms. Carl are members of "the people" claiming the right to possess a gun—to "keep and bear arms." U.S. Const. Amend. II. Sections 922(g)(1) and (g)(3) necessarily burden that right by restricting their firearm possession. *Bruen*, 597 U.S. at 24 ("When the Second

Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.")   The question becomes whether the government can justify the regulations by showing they are consistent with the principles underpinning our historical tradition of regulating firearms.  *Bruen*, 597 U.S. at 24.

### C.   Mr. Worster's challenges

Mr. Worster raises challenges to Counts III and IV of his indictment, which respectively implicate § 922(g)(1), banning felons from possessing firearms, and § 922(g)(3), banning users of illegal substances from possessing firearms.  The Court addresses these challenges individually and in turn.

### 1.   Count III: Felon in possession

Before conducting the "history and tradition" analysis, the Court must start with precedent.  Neither *Bruen* nor *Rahimi* reversed binding First Circuit precedent affirming the constitutionality of § 922(g)(1).  And "until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority."  *Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004), *abrogation on other grounds recognized by Carson as Next Friend of O.C. v. Makin*, 596 U.S. 767 (2022).

The relevant First Circuit precedent is *United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011).  There, the First Circuit upheld a conviction under § 922(g)(1) after *Heller* and *McDonald*, explaining that those decisions did not "cast

doubt on such longstanding regulatory measures as prohibition on the possession of firearms by felons." *Id.* at 112–13 (quoting *McDonald*, 561 U.S. at 786). District courts in this Circuit have concluded that *Bruen* did not overrule *Torres-Rosario. See, e.g., United States v. Johnson,* No. 23-cr-10043-ADB, 2024 WL 199885, at *2–*4 (D. Mass, Jan. 18, 2024); *Fulcar*, 701 F. Supp. 3d at 53–55.

The Court agrees for several reasons. First, *Bruen* considered the constitutionality of New York's licensing scheme for the public carrying of firearms, not the constitutionality of § 922(g)(1); in *Torres-Rosario*, the First Circuit expressly dealt with § 922(g)(1). Second, the "First Circuit relied upon the Supreme Court's emphasis in *Heller* and *McDonald* that such decisions did not cast doubt" on § 922(g)(1). *Fulcar*, 701 F. Supp. 3d at 54. "*Bruen* left these assurances undisturbed, instead abrogating the application of means-end scrutiny." *Id.* Third, as the *Fulcar* court observed, "the concurrences and the dissent in *Bruen* indicate that at least six of the Justices at the time (and five of the current Justices) read the majority opinion as maintaining the status quo as to the constitutionality of felon in possession laws like § 922(g)(1)." *Id.* (counting the votes).

For now, that is sufficient to settle Mr. Worster's challenge to Count III. After all, in *Torres-Rosario*, the First Circuit "acknowledged the possibility of as-applied challenges to § 922(g)(1), but found that such cases would be limited to those in which the underlying felony is 'so tame and technical as to be insufficient to justify the ban.'" *Johnson*, No. 23-cr-10043-ADB, 2024 WL 199885, at *4 (quoting *Torres-Rosario*, 658 F.3d at 113). Mr. Worster's criminal history, however, falls outside the scope of that

exception.   His criminal record includes multiple drug-related crimes, multiple firearm-related crimes, and two counts of possessing an explosive device—far from "tame and technical." (ECF No. 92-2 at 2–4.) So, his as-applied challenge necessarily fails under *Torres-Rosario*.

For the same reasons, Mr. Worster's as-applied challenge to § 922(g)(1) would also fail under *Bruen*.   Courts have consistently upheld application of § 922(g)(1) to individuals whose past felonies related to firearms and weapons. *See, e.g., United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) ("Bullock previously misused a firearm to harm others when he shot one individual, fired into a crowd of others, and in the process killed an innocent passerby.   A ban on his ability to possess a firearm 'fits neatly' within our Nation's historical tradition of firearm regulation."); *United States v. Williams*, 113 F.4th 637, 662 (6th Cir. 2024) ("Because Williams's criminal record shows that he's dangerous, his as-applied challenge fails.").   On the other hand, the one circuit to invalidate § 922(g)(1) as applied did so when the challenger was only "convicted of food-stamp fraud" nearly thirty years prior and the record contained "no evidence that [the challenger] poses a physical danger to others." *Range*, 124 F.4th at 232.

That all makes good sense.   The historical record demonstrates "that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) (collecting sources); *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) ("The historical touchstone is danger[.]").    For instance, "[d]ebates from the Pennsylvania,

Massachusetts, and New Hampshire ratifying conventions, which were considered 'highly influential' by the Supreme Court in *Heller* ... confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." *Binderup*, 836 F.3d at 368 (Hardiman, J., concurring). "So, the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public." *Id.*

Given repeated judicial determinations that Mr. Worster presented a danger to the public, as shown by criminal convictions on separate occasions for drug trafficking, illegal firearm possession, and illegal possession of explosive devices, § 922(g)(1)'s application to him fits neatly within the Nation's history and tradition.[8]

The Court will thus deny Mr. Worster's motion to dismiss Count III.

### 2.    Count IV: Unlawful user in possession

But the same historical test leads to a different conclusion about the constitutionality of § 922(g)(3) as applied to Mr. Worster. The government provides no binding constitutional decision from the First Circuit restricting this Court's analysis. So, the question becomes "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

---

[8] Looming in the background of the dangerousness inquiry is what Judge Carlton Reeves has identified in *Bullock* as "the problem of individual adjudication." 679 F. Supp. 3d at 531–34. This Court need not draw the exact line of what felonies constitute dangerous ones, but it can say with confidence that Mr. Worster's criminal history puts him on the opposite side of the line as the challenger in *Range*, for instance. *Range*, 124 F.4th at 232.

Section 922(g)(3) is a sweeping law.  It provides that "[i]t shall be unlawful for any person ... who is an unlawful user of or addicted to any controlled substance ... [to] possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(3).  On its face, it bans all possession of firearms for an undefined set of controlled substance users, even while they are not actively intoxicated.  Still, the First Circuit has poured some substance into the statute: "To establish the 'unlawful user' element of this offense, the government must prove beyond a reasonable doubt that (1) the defendant used controlled substances regularly, (2) that the use took place over a long period of time, and (3) that the use was proximate to or contemporaneous with his possession of a firearm." *United States v. Tanco-Baez*, 932 F.3d 7, 15 (1st Cir. 2019).

To meet its burden, the government primarily relies on *United States v. Posey*, 655 F. Supp. 3d 762, 773 (N.D. Ind. 2023).  *Posey* rejected an as-applied challenge to § 922(g)(3) based on the complicated effects of a presidential pardon, and it rejected a facial challenge by relying on *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), a pre-*Bruen* case. But *Yancey*, *Posey*, and the laws provided by the government seem largely irrelevant to the *Bruen* inquiry.  After all, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34.  The closer to the Founding, the better, because that was when the scope of the right was set. *Id.* Many of the supposedly "entrenched" laws disarming mentally ill people and drug addicts—particularly those from states not in existence at the Founding, like

California, Colorado, Hawaii, Minnesota, Montana, Nevada—are thus unhelpful here. (ECF No. 92 at 18 n.4.)

The strongest evidence the government provides are the historical intoxication laws. (ECF No. 92 at 18.) But these laws largely seem to be from the late nineteenth century, so they offer little assistance in determining the scope of the right when it was adopted in 1791. (ECF No. 92 at 18 n.3). And even taking these laws as an important part of the Nation's tradition, all they seem to show is that "some laws banned *carrying* weapons while under the influence, none barred gun *possession* by regular drinkers." *United States v. Connelly*, 117 F.4th 269, 280 (5th Cir. 2024) (analyzing similar laws). Even under the First Circuit's narrower interpretation of § 922(g)(3), requiring "proximate" or "contemporaneous" drug use and firearm possession, the Court struggles to see an on-point historic analogue. *See, e.g., United States v. Daniels*, 124 F.4th 967, 975 (5th Cir.) ("And even if the government had persuaded the jury that Daniels was frequently intoxicated, here, as in *Connelly*, the government offers no Founding-era law or practice of disarming ordinary citizens 'even if their intoxication was routine.'") So, while § 922(g)(3) and these laws "may address a comparable problem," preventing intoxicated people from carrying weapons, "they do not impose a comparable burden on the right holder." *Id.*

All that the government alleged was that Mr. Worster had a medical marijuana card in his name, "a small marijuana grow with two mature marijuana plants, and a small bag of dried marijuana" at the time of the search. (ECF No. 92 at 3.) That tells the Court little about his drug use, and, most importantly for the constitutional

analysis, nothing suggests he was intoxicated at the time of his arrest. But "under the government's reasoning, Congress could (if it wanted to) ban gun possession by anyone who has multiple alcoholic drinks a week from possessing guns based on the intoxicated carry laws." *Id.* at 282. *Bruen* and *Rahimi* "cannot stretch that far," and § 922(g)(3) imposes a "far greater burden" on Mr. Worster's Second Amendment rights "than our history and tradition of firearms regulation can support." *Id.*

Because the government has not met its burden under *Bruen*, the Court will grant Mr. Worster's motion to dismiss Count IV.

### D.    Ms. Carl's challenges

That leaves Ms. Carl's challenges. Like Mr. Worster, she alleges that § 922(g)(3) is unconstitutional as applied to her. And from that, she argues that her false statement charges should be dismissed because her answers to the drug user questions were "immaterial to the lawfulness of the sale." (ECF No. 91 at 5.) The Court addresses these arguments in turn.

#### 1.    Count V: Unlawful user in possession

The Court need not recount the government's position about § 922(g)(3) here, because it is materially the same as explained above. *See, e.g.*, ECF No. 96 at 8–9 (making the same arguments about *Posey* and *Yancey*).

Again, the government has failed to meet its burden, and the case is even clearer for Ms. Carl. The Court finds the Fifth Circuit's decision in *United States v. Connelly* to be on all fours. 117 F.4th 269. After surveying both Founding-era laws and post-Reconstruction laws about the relationship between guns and alcohol, the

court held that "history and tradition surrounding intoxication laws may address a problem comparable to § 922(g)(3), but do not impose a comparable burden in doing so." *Id.* at 279–82. Put differently, "they pass the 'why' but not the 'how' test" under *Bruen*, because they impose significantly greater temporal limits on firearm possession. *Id.* at 281–82 ("Taken together, the statutes provide support for banning the carry of firearms while actively intoxicated. Section 922(g)(3) goes much further: it bans all possession, and it does so for an undefined set of 'user[s],' even while they are not intoxicated.")

To boot, Ms. Carl is closely situated to the defendant who raised a successful as-applied challenge in *Connolly*. Like her, Ms. Worster has no criminal history and stated that she uses marijuana once or twice a week (ECF No. 96 at 2). And like in *Connelly*, the Court does not "know how much she used at those times or when she last used, and there is no evidence that she was intoxicated at the time she was arrested." 117 F.4th at 282. So "by regulating [Ms. Worster] based on habitual or occasional drug use, § 922(g)(3) imposes a far greater burden on her Second Amendment rights than our history and tradition of firearms regulation can support." *Id.*

Because the government has not met its burden under *Bruen*, the Court thus grants Ms. Carl's motion to dismiss Count V.

### 2.    Count VI and Count VII: Derivative charges

That leaves Count VI and Count VII, arising from false statements about drug use that Ms. Carl made while buying a firearm in violation of § 922(a)(6) and

§ 924(a)(1)A.    The government argues that because Ms. Carl "advances no [substantive] arguments concern[ing] Sections 922(a)(6) and 924(a)(1)(A)," her motion should fail.  (ECF No. 96 at 11.)

The government has it backward.  If the defendant challenges a regulation that affects protected Second Amendment conduct—as these statutes necessarily do by putting conditions on purchasing firearms— the government bears the burden of showing that it is consistent with the Nation's history and tradition.  *Bruen* is crystal-clear on this point:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  *The government* must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. at 1 (emphasis added).  Puzzlingly, the government here provides no historical analogues, only citations to other cases affirming the statutes' constitutionality.  But a mere volume of cases is not enough.  *See, e.g., Heller*, 554 U.S. at 624 n.24 (rejecting decisions of "hundreds of judges").

Because the government has not met its burden under *Bruen*, the Court thus dismisses Counts VI and VII.

## IV.    CONCLUSION

Mr. Worster's Motion (ECF No. 89) is DENIED as to Count III but GRANTED as to Count IV.  Ms. Carl's Motion (ECF No. 91) is GRANTED in full.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Chief Judge

February 5, 2025